[Cite as *In re B. P.*, 2011-Ohio-1863.]

STATE OF OHIO        )          IN THE COURT OF APPEALS
                         )ss:      NINTH JUDICIAL DISTRICT
COUNTY OF LORAIN    )

IN RE: B. P.                        C.A. No.     10CA009934

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    09JC26865

DECISION AND JOURNAL ENTRY

Dated: April 18, 2011

CARR, Presiding Judge.

{¶1} Melissa L. appeals from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor child, B.P., and placed him in the permanent custody of the Lorain County Children Services Board ("LCCS"). This Court affirms.

I.

{¶2} B.P. was born on February 20, 2009, and is the child of Melissa L. ("Mother") and Charles P. ("Father"). Both parents participated in the proceedings below, but only Mother appealed from the judgment of the trial court.

{¶3} When B.P. was born, Mother was already engaged in another custody case involving four older children, ranging in age from three to eleven years. LCCS had been involved with the family since 2007, based upon concerns for Mother's mental health, unsafe and unsanitary conditions of the home, and the children's poor school attendance. In August

2008, those four children were adjudicated abused, neglected, and dependent, and they were placed in the temporary custody of the agency. B.P. was born six months later. LCCS initially attempted to allow B.P. to remain in Mother's home, as Mother was making some progress on the case plan objectives put in place through the first proceeding. Soon, however, the agency again developed concerns regarding the home environment and Mother's ability to meet the basic needs of B.P. Accordingly, LCCS filed a complaint regarding B.P. on July 23, 2009. That complaint articulated concerns for the safety of B.P. based upon the large number of adults living in Mother's home, the unsanitary condition of the home, a limited supply of food, and a pending eviction due to unpaid rent. In October 2009, the trial court adjudicated B.P. to be a dependent child and placed him in the temporary custody of the agency. Three months later, the first case resulted in a judgment involuntarily terminating Mother's parental rights to the four older children. This Court later affirmed that judgment. See *In re M.M, J.H., M.H., L.L.*, 9th Dist. Nos. 10CA009744, 10CA009745, 10CA009746, 10CA009747, 2010-Ohio-2278.

{¶4} On June 30, 2010, LCCS filed a motion for the permanent custody of B.P. Following a hearing on the motion, the trial court granted permanent custody of B.P. to the agency. Mother now appeals and assigns one error for review.

II.

**ASSIGNMENT OF ERROR**

"THE JUDGMENT GRANTING PERMANENT CUSTODY OF B.P. TO LORAIN COUNTY CHILDREN SERVICES IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶5} Mother argues that the trial court erroneously determined that the weight of the evidence supported a finding that B.P. could not be placed with either parent within a reasonable time or should not be placed with a parent.

**{¶6}** Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, *In re William S.* (1996), 75 Ohio St.3d 95, 98-99. Clear and convincing evidence is that which will "produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *In re Adoption of Holcomb* (1985), 18 Ohio St.3d 361, 368, quoting *Cross v. Ledford* (1954), 161 Ohio St. 469, paragraph three of the syllabus.

**{¶7}** Following a hearing, the trial court found that B.P. could not be placed with either of the child's parents within a reasonable time and should not be placed with the child's parents. The trial court also found that it was in the best interest of the child to be placed in the permanent custody of LCCS. On appeal, Mother does not challenge the finding regarding the best interest of B.P., but rather challenges the finding that the child could not or should not be placed with a parent as being unsupported by the weight of the evidence. For the reasons that follow, we find her argument to be without merit.

**{¶8}** In considering whether a child could not be placed with either parent within a reasonable time or should not be placed with a parent, the trial court is to consider all relevant evidence. R.C. 2151.414(E). Furthermore, R.C. 2151.414(E) contains several factors, the presence of any one of which requires the court, upon a finding of clear and convincing evidence

that the factor exists, to enter a finding that the child cannot be placed with a parent within a reasonable time or should not be placed with a parent. Id.

{¶9} While the trial court did not explicitly cite to any of the factors in R.C. 2151.414(E), the detailed findings in its journal entry make it apparent that the trial court relied on several of the factors in R.C. 2151.414(E), including R.C. 2151.414(E)(1), failure to remedy conditions; R.C. 2151.414(E)(2), chronic mental or emotional illness; and R.C. 2151.414(E)(11), parental rights involuntarily terminated with respect to a sibling. In her appeal, Mother has not challenged the findings in regard to a particular factor, nor has she argued that the failure to cite a particular factor is reversible error. Instead, she has challenged only the broader determination that B.P. cannot or should not be placed with a parent. In addressing Mother's argument, we reiterate here that "the better practice would be for the trial court to indicate the specific factor or factors in R.C. 2151.414(E) upon which it is relying in reaching its determination, so that proper review is ensured." *In re S.C.*, 9th Dist. No. 04CA008469, 2004-Ohio-4570, at ¶30.

{¶10} Mother's reunification case plan indicated that she should participate in a parenting assessment and an education program with an in-home parenting mentor, obtain appropriate housing and gainful employment in order to meet the basic needs of her child, and participate in a mental health assessment and follow any recommendations. Mother was also offered weekly visitation with her child.

{¶11} According to the caseworker, when B.P. was removed from the home, he had no affect and displayed no emotion. He did not laugh or cry. He was fine physically, but he appeared to have been emotionally neglected. At eight months of age, he was not able to sit up, hold his head up for more than a split second, or roll over. The caseworker believed that Mother was not able to provide for his emotional needs and that Mother's lack of active interaction with

the child contributed to his poor development. By way of contrast, within five days of being placed with foster parents and having received intense interaction in that home, B.P. was rolling over, sitting up on his own, and trying to hold his head up. It took the child several months to show emotions such as crying or even indicating that he was hungry. The caseworker explained that, one year later, B.P. has made a great deal of progress. She did not believe that this change was merely the result of age, but rather resulted from the constant good interaction and emotional support B.P. was receiving from the foster parents.

{¶12} The trial court found that Mother had not made significant progress on her case plan and had not demonstrated an ability to meet the child's basic needs or safely parent her child. In order to address parenting skills, Mother had been referred to an in-home parenting mentor, who found it necessary to focus first on Mother's ability to meet her own basic needs. The mentor terminated his services after only a couple of months because Mother was not following through with his advice. The caseworker testified similarly that Mother failed to implement her suggestions on parenting, including increasing her interaction with B.P.

{¶13} In addition, the trial court found that Mother's housing and employment were not stable. Mother was evicted from a trailer early in the proceedings, placed B.P. in Blessing House while she stayed in motel rooms for about a month, and then stayed in another residence for approximately eight months. She and the maternal grandmother stayed together in the motel rooms and in their last residence. At the time of the permanent custody hearing, Mother and the maternal grandmother had not paid any rent for five or six months and they were aware that their residence was in foreclosure. Significantly, Mother had saved no money, had no plans for another place to live, and had nowhere to go. Mother had no regular employment, but had worked periodic jobs for temporary agencies. She and the maternal grandmother purportedly

shared expenses. The maternal grandmother testified that Mother contributed money when she was able. The caseworker testified that Mother was behind on all her bills and that Mother had often provided her with false information about employment and housing.

{¶14} The trial court expressed particular concern that Mother had not resolved the mental health issues that had existed since the first case. According to Mother's counselor, Mother had not completed her mental health treatment. Mother began attending counseling sessions in September 2008, as part of the first case. Initially, her attendance was fairly consistent, but it gradually deteriorated. Mother stopped attending counseling altogether in October 2009, just about the time of B.P.'s adjudication and disposition. The counseling agency closed Mother's case two months later. Mother testified that she had been prescribed medication for her depression, but was told to stop taking it when she became pregnant. Mother reengaged in counseling in May 2010, after a bout of depression that reached its worst point on Mother's Day. During the next five months, Mother attended six counseling sessions and missed three.

{¶15} Mother's counselor stated that Mother had not fully addressed past abuse and traumatic experiences and that omission affected her ability to avoid the unhealthy choices she had been making. The caseworker stated that Mother failed to accept responsibility for her bad decisions and had a problem telling the truth, which resulted in unsafe situations. The caseworker explained, for example, that if Mother had been honest about being behind in her trailer payments, she could have helped her devise a plan to avoid eviction. The caseworker also stated that Mother has not accepted responsibility for the removal of her child, but instead claimed that "her ex-husband tried to steal her child and sell him in Peru." Finally, the caseworker stated that Mother exercised poor judgment when she took B.P. to visit a registered sex offender. The sex offender was an uncle who lived near Mother's home. He testified at the

permanent custody hearing that Mother would bring B.P. to his house every other week during her scheduled visitations.

{¶16} When Mother reengaged in counseling in May 2010, she was advised to have a psychiatric assessment and to participate in Dialectical Behavior Therapy ("DBT"), a group therapy program that met weekly for a year and addressed emotion regulation, co-dependency issues, and healthy coping skills. Mother attended one session before the permanent custody hearing. In its appeal, LCCS criticizes Mother for only attending one session, but, at the same time, concedes that Mother began the sessions at the first available opportunity after the program was recommended to her. Both the counselor and caseworker were hopeful that the DBT group would permit Mother to internalize certain concepts and successfully apply them to her life, but neither witness could guarantee that Mother would be able to do so. The caseworker also opined that a year "in Limbo" was too long for B.P. to wait on something that may not be successful. The trial court concluded that B.P. could not wait a year before achieving permanency.

{¶17} As to Father, the trial court found that he had failed to maintain sobriety. There was evidence before the trial court that he had relapsed at least twice in the last year. In addition, Father refused to do additional drug tests that were requested by the caseworker. Father also failed to demonstrate a commitment to his child given that he missed 13 visits in the last two months and had been inconsistent in attending visits during the three months before that. At one time, LCCS had hoped to place B.P. with Father and his long-time girlfriend, Pat, who seemed to provide good care to B.P. during visits. There was conflicting testimony, however, as to whether Pat was willing to accept a permanent role in the care of B.P. In addition, Pat testified that Father would leave home for several days at a time, although she did not believe he would continue to do so if B.P. were permanently placed with them. Father was unemployed and had

no income of his own. He relied largely on Pat's employment for financial support. Father had applied for social security disability, but his eligibility was not resolved at the time of the hearing. Father was on probation for non-support of two other children. Ultimately, the trial court was not convinced that their home would be a stable placement for B.P.

{¶18} Regarding the second prong of the permanent custody test, the trial court found that it was in the best interest of B.P. to be placed in the permanent custody of the agency. See R.C. 2151.414(D)(1). The caseworker testified on the subject of the parents' relationships with the child. She stated that B.P. "absolutely" had a bond with Mother and a less strong bond with Father. There was also evidence before the trial court, however, that Mother did not actively interact with her child during visits. The maternal grandmother often interacted more with the child than Mother did. The trial court found that Mother's interaction with B.P. was "average at best" and had been minimal in recent months. Father's attendance at visitation had declined sharply in recent months.

{¶19} Mother and Father each testified at the hearing. They each claimed to love B.P. and to be able to provide a good home for him. Several friends and relatives testified in support of the parents' efforts to regain custody and regarding the parents' relationships with B.P. In general, those witnesses stated that they believed each parent loved B.P. and that B.P. seemed happy in the parent's care. These witnesses essentially stated that they had no concerns about either parent's ability to care for B.P.; that Mother had mood swings, but they did not interfere with her ability to meet the child's needs; and that Father had a history of alcohol problems, but that those problems were under control.

{¶20} B.P.'s custodial history is that he had resided with Mother for the first five months of his life and then resided in a foster home for a year. The caseworker explained that B.P. had a

very strong attachment to his foster parents, as well as to an older half-brother, who resided in the same home. B.P.'s foster parents had a monthly visitation plan with the foster parents of B.P.'s three other siblings in order that all the children could maintain those relationships. B.P.'s foster parents would like to adopt him if permanent custody is awarded to the agency.

{¶21} Because of B.P.'s young age, the guardian ad litem expressed the wishes of the child. She believed that permanent custody was in B.P.'s best interest. She had worked with Mother for a year in the first case before continuing to work with her in the present case. She testified that although Mother was excited to see B.P. at visits, there was very little interaction between them. She particularly noted that she had seen no change in Mother's parenting ability from the time of her initial observations until the time of the hearing. The guardian ad litem expressed concern with Mother's lack of follow-through in such things as finding housing, obtaining regular employment, and implementing suggestions regarding the care of B.P. She noted that Father interacted well with B.P. when he attended visits, but that he was very inconsistent in his attendance. She also expressed concern with Father's dependence on Pat for income and support.

{¶22} There was evidence before the trial court that supported its conclusion that B.P. needed permanency and that neither of his parents could provide it. The caseworker testified that Mother had made only minimal progress on her case plan. Although Mother had improved the physical condition of her living arrangements at one point, she was about to lose her housing again and had no plans for another place to live. Moreover, the caseworker testified that Mother had previously lost custody of four children, and she had made no significant changes in her ability to provide safe, lasting care for this child. She also believed that alcohol dependence made Father unable to provide a home for B.P. According to the caseworker, the testimony that

Father leaves home for days at a time and missed many visits with his son is reflective of the bad choices he makes. She concluded that neither parent is in a position to provide safe care of the child and that B.P. does not deserve to wait any longer for permanency. She believed that permanent custody was in the best interest of the child. Neither parent offered suitable relative placements.

{¶23} In addition to a general claim that the agency did not establish that B.P. could not or should not be placed with a parent, Mother argues that despite the agency's stated goal of reunification, LCCS had actually been seeking to obtain permanent custody of B.P. since December 2009. In support of her argument, Mother refers to a statement in the December 2009 Semiannual Administrative Review indicating that the agency intended to file for permanent custody "within the next few weeks." The full paragraph is as follows:

> "During this review period, LCCS was granted permanent custody of [B.P.'s] four older siblings. The issues that originally caused LCCS to become involved with this family two years ago have [not] been resolved. [Mother] has no stable housing, no employment, and no way to meet her own basic needs independently of other people. [Father] also has no way to support himself seperate (sic) from his girlfriend, and that relationship is fairly unstable. [B.P.] would be at high risk of continued neglect if [he] was to be reunified with either of his parents at this time. *LCCS does intend on filing for PC of [B.P.] within the next few weeks.*" (Emphasis added.)

LCCS could have filed for permanent custody of B.P. in December 2009, but it could also wait until June 30, 2010, as it did. In her brief, Mother has not provided any argument as to prejudice accruing to her by the delay in filing the motion, nor has she specifically pointed to a lack of effort by the agency after December 2009. It is not for this Court to develop arguments for the parties or speculate as to any existing prejudicial impact.

{¶24} A review of the record demonstrates, to the contrary, that LCCS continued its reunification efforts after the review in December 2009. In fact, shortly after that review, the

agency was actively involved in attempting to arrange for a placement of B.P. with Father and Pat. Even the foster mother testified that she understood a placement with Father was "inevitable" at that point. Several Friday-to-Sunday visits had taken place in Father's home, and the agency proceeded along those lines from February 2010 until May 2010, when that option was no longer considered viable. During the same time period, LCCS also continued reunification efforts with Mother. For example, when Mother had transportation problems in February 2010, the agency started transporting the child to Mother's home for visits. This arrangement involved weekly four-hour visits and lasted from February 2010 until September 2010, when a medical doctor suggested that visits be moved back to the visitation center because residual cigarette smoke in Mother's home aggravated B.P.'s asthma. In addition, the record demonstrates that Mother was newly referred for a psychiatric evaluation in May 2010, and that she also reengaged in counseling at that time. The caseworker even attended counseling sessions with Mother in the summer of 2010 in an effort to accelerate some positive results. In the absence of any concrete argument with references to facts of record, we find no merit in Mother's unsupported allegation that the agency had been seeking to obtain permanent custody of B.P. since December 2009.

{¶25} Mother also complains that "LCCS was unwilling to concede that if [Mother] internalized the concepts presented in the dialectical therapy group, she would be in a position to be reunified with B.P." The facts in evidence do not compel such a conclusion by the caseworker or the counselor, and any such claim would have been entirely hypothetical.

{¶26} Upon consideration, this Court concludes that there was ample evidence before the trial court from which it could determine that B.P. could not be placed with either parent within a reasonable time or should not be placed in the care of either parent. Consequently, the

trial court did not err in terminating Mother's parental rights and placing B.P. in the permanent custody of LCCS. Mother's sole assignment of error is overruled.

III.

{¶27} Mother's assignment of error is overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

WHITMORE, J.
DICKINSON, J.
CONCUR

APPEARANCES:

HOLLACE B. WEIZEL, Attorney at Law, for Appellant.

DENNIS P. WILL, Prossecuting Attorney, and AMY L. PRICE, Assistant Prosecuting Attorney, for Appellee.